[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of proceeding:
By petition filed in this court on 7/5/90, the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Tanya C. (also known as Tanya W.) in her son Eric W., alleging three of the four nonconsensual grounds set forth in subsection (b) of Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1989) applicable to children who, like Eric, were previously committed to DCYS as neglected or uncared for. The facts underlying all of the alleged grounds for terminating parental rights are the same: The child, born 8/20/89 suffering from his mother's use of cocaine prior to his birth, has seen his mother only once since he was three days old, on December 7, 1989. For nearly all of his life her whereabouts have been unknown to his caretakers. Because of this, service by publication was ordered and confirmed at the initial hearing on the instant petition on 7/26/90. Following a default trial, the court found clear and convincing evidence that all three pleaded statutory grounds for terminating Tanya's parental rights existed as of the date the petition was filed:
1) Abandonment;
2) Failure to rehabilitate;
3) Absence of parent-child relationship.
An order terminating her parental rights could not be entered on that date, however, because of the petitioner's failure to submit the social history mandated by Sec. 45-61, subsection CT Page 665 (e)(1), incorporated by reference in subsection (b) of Sec. 17-43a. On 8/24/90, upon receipt of the mandated study and due consideration of the six factors set forth in subsection (b) of Sec. 17-43a, the court found clear and convincing proof that termination of parental rights was in Eric's best interests. Judgment was entered terminating Tanya's parental rights and appointing the Commissioner of DCYS statutory parent for the purpose of placing the child in adoption pursuant to subsection (f) of Sec. 45-61f.
Eleven days later, on September 4, 1990, Tanya contacted DCYS from Niantic prison where she had been sent after being arrested two weeks earlier on one of three outstanding warrants. She was referred to Legal Assistance for Prisoners which assigned her an attorney who promptly filed a motion to reopen for lack of actual notice. On 9/20/90 the motion was granted, over objection of the petitioner, but as to disposition only, the court finding that notice by publication was valid at the time required for service under the provisions of subsection (c) of Sec. 4-61d, and lacking any offer of proof as to a valid defense to the prima facie case presented by the petitioner on any of the three grounds for termination of parental rights. The matter was continued to 9/24/90 and thereafter to 10/29/90 when all parties rested and given to 11/19/90 for the filing of trial memoranda.
Facts:
Evidence offered in three days of trial supports the finding of the following facts:
Tanya C. was partly raised in a DCYS foster home and still regards her foster mother, Barbara W., as her "mother" whose name she frequently (but not always) uses, most recently on a hospital admission of 8/21/90. (State's Exh. C.) A high school graduate with some post-high school education, Tanya had an early history of sustained employment but in the decade preceding Eric's birth she changed jobs and homes with increasing frequency, acquired a long record of arrests and convictions for larceny, and gave birth to two other children out of wedlock. A boy, born 2/5/81, committed to DCYS as abandoned on 8/30/90, and a girl, born 2/26/86, presently in the custody of an unrelated family by order of the Probate Court.
Eric was born 8/20/89 testing positive for cocaine, his mother having used drugs and eschewed prenatal care throughout her pregnancy. By her own admission, she began taking cocaine in late 1988, soon after becoming pregnant with Eric. At the time of Eric's birth, Tanya was homeless, and on 8/23/89 she gave DCYS voluntary permission to place him in foster care CT Page 666 whenever he became able to leave the hospital for a home setting. Although Eric remained in the hospital for two more weeks, Tanya (not then incarcerated) did not visit him there again. On 9/5/89 when ready for foster placement, Tanya could not be located to accompany the baby to the foster home. Long after the fact, DCYS learned that on 9/20/89 Tanya was incarcerated in Niantic for nearly two months. During that period she did not contact DCYS either to inquire as to the welfare of her infant or to inform the agency of her whereabouts.
On 11/5/89 Tanya was discharged from Niantic to the home of her biological mother, Gladys C., under supervised home release. Two weeks later she contacted DCYS requesting a visit, the first since 8/23/89. At the time of her call she had moved to a shelter for battered women. She was told on 1/4/90 that she could have her baby placed with her there but she declined, informing the social worker that she would be getting an apartment soon and wanted to wait until then to regain the baby's custody. A visit took place on 12/7/89, the DCYS social worker transporting her to the foster home. At its conclusion, Tanya informed the social worker that she would be requesting another visit before Christmas. No such request was made. In January, learning of a warrant for arrest for her unauthorized departure from her supervised home release placement, the staff at the Interval House urged her to clear up the matter so that she could remain at the shelter since it could not house persons with outstanding warrants. Tanya did not do so but, instead, left Interval House and remained whereabouts unknown to DCYS for the next seven months.
Notwithstanding DCYS policy to file petitions 90 days after a child is voluntarily placed in foster care, no petition was filed in this court until 1/5/90. Tanya was served with a copy of that petition at Interval House, but failed to appear in court on 2/8/90 for a number of reasons: She was taking drugs and was unsure of the nature of the court hearing; she was avoiding arrest on the outstanding warrant. On 2/8/90, following a default trial, Eric was found to be neglected and uncared for by reason of his condition at birth resulting from his mother's abuse of drugs, and her subsequent disappearance from his life leaving him both abandoned and homeless. He was committed to DCYS pursuant to subsection (d) of Sec. 46b-129. No expectations were spelled out for Tanya to achieve in order to be reunited with her son since she failed to appear for the hearing.
One week after Eric was committed, Tanya called DCYS stating she was then living in New Haven and would not be able to visit her baby because she planned to start a full time job CT Page 667 the following week. During the next six months, while her whereabouts continued to be unknown to DCYS, Tanya successfully eluded arrest and although remaining in the Hartford area, she asked for no further contact with Eric. In fact, from April until August of 1990 when evicted for nonpayment of rent, she had secured an apartment in her own name and brought her two older children to live with her there in June. Although telling her foster mother, Barbara W., that she was visiting Eric regularly and planned to have him join the family soon, in fact during this period she did not once call DCYS to ask to see Eric or to inquire as to his welfare. In testifying, Tanya acknowledged this was because she was avoiding arrest under the warrant of January of 1990, but did not explain why a telephone call to inquire as to her son's welfare would have exposed her to arrest.
On 8/10/90 Tanya was arrested for new charges of larceny and possessing drug paraphernalia in West Hartford. Giving the name of Tanya C., she was released on her promise to appear on 8/13/90. She did not appear. On 8/24/90 Tanya was arrested in Manchester for attempted larceny and drug offenses. She would have been released again but discovery of the existance [existence] of three other outstanding warrants led to her placement in Niantic. Between the two arrests, she had been hospitalized at St. Francis under the name of Tanya W., giving her foster mother's name as her next of kin and admitting, according to the discharge summary, a continuing cocaine habit. (State's Exh. C.) On 9/12/90 she was sentenced to two years for violation of probation in one case, but remains unsentenced on the other outstanding charges.
At the time of giving her testimony on 10/29/90, Tanya was again eligible for supervised home release but chose not to be released until she could be admitted to an inpatient drug treatment program. By her own estimate, if released back on the streets, she predicted she would return to drug use. Admitting to multiple arrests since 1982, she testified that "If it didn't say `jail' it didn't register with me." She admitted that she had not come to court on 2/8/90 in connection with the earlier neglect petition because she was avoiding service of outstanding warrants, and recently she had given three different police departments different names and addresses on one arrest giving her cousin's New Haven address as her own. She admitted that she would not be in any condition to take care of Eric until after she completed an inpatient drug treatment program, but she had no idea when she might be accepted, how long they last, what they are like, or what her alternate plan for Eric would be if she is not accepted into any such program. She admitted that she had been evicted from the last two apartments she had rented in her own name for nonpayment of rent. She explained her late CT Page 668 initiation into drug use as the aftermath of having sold drugs in order to secure more income than she was able to obtain from work or writing bad checks. At first she started to sniff cocaine, but her allergies precluded this, so she began to smoke. Asked why she began this form of drug use at the outset of her pregnancy with Eric, after having had two successful drug-free pregnancies, she replied that she "liked the high". Adjudication: On facts as of 7/5/90 (date petition filed)
1. This record supports by clear and convincing proof not only abandonment as defined in Sec. 17-43a as the failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child", but also by the more stringent standards of common-law abandonment, in the sense of a total and complete cessation of all contact. Except for one visit on 12/7/89, Tanya did not see or inquire after her son after leaving him in hospital at the age of 3 days, until the filing of this petition. While this period is six weeks short of the 12 months required by the statute, waiver of that portion of the required time is necessary from the totality of the circumstances surrounding this child in order to promote his best interest. (Sec. 17-43a, subsection (c).)
2. When Eric was placed in foster care, his mother's whereabouts soon thereafter became unknown to DCYS. It remained unknown until this petition was filed. The record disclosed that during this period Tanya continued drug abuse, continued to violate the law and evade arrest for prior violations. Although she had secured an apartment, she soon lost it for nonpayment of rent. She refused to enter drug treatment despite the entreaties of her foster mother who had helped her care for her older children during this period. As of 7/5/90 she had manifested not the slightest interest in the welfare of Eric. This constitutes clear and convincing proof of a failure "to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child [emphasis added] . . . . [she] could assume a responsible position in the life of the child."
3. It takes no clinical expert witness to infer from the fact that an eleven month old child who has seen his mother only once, at the age of two months, since infancy, can not have with her a "relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." That alone, of course, is not grounds to terminate a parent's rights. However, these circumstances — a well established cocaine habit in a woman who had never attempted drug treatment until incarcerated, and whose date and conditions of release from prison are unclear — compel the conclusion that "to allow further time for the establishment CT Page 669 . . . of such parent-child relationship would be detrimental to the best interest of . . . [this] child". Eric has already suffered three foster placements in less than a year, and his need for a secure, nurturing permanent home is critical if he is to maximize a potential which may well prove to have been damaged by his mother's heavy use of cocaine before his birth.
There is thus found, by clear and convincing proof, all three of the grounds pleaded for the termination of Tanya's parental rights.
Disposition — on facts as of 10/29/90 (final day of trial)
Tanya's potential to become Eric's secure and permanent caretaker within a period of time that he could afford to wait was made no clearer by her appearance in court than it was at the time the default disposition was entered two months earlier: Except for expressing her intent to engage in inpatient drug treatment, which she had failed even to attempt in the preceding two years despite the urging of her foster mother, she appears to be no nearer to being able to care for Eric than she was when she agreed to his placement at the age of three days. She continues to abuse cocaine. She is now tangled in the web of court proceedings that she was able to evade for nine months. She began to address them not because she turned herself in in order to be able to have her baby placed with her, as was suggested in January of 1990, but because she was arrested again. Her current sentence could keep her in Niantic until 1993; her plan to be released to an inpatient drug program had only been formulated three weeks before she testified; the date of placement in such program and the likelihood that she will complete it successfully and remain drug free thereafter are all matters of speculation. Her expressed intention to take all three children to live with her at one time, rather than phase them in one at a time; her distrust of AFDC combined with a reasonable reluctance to resume care of the child without adequate insurance; her eleventh hour resolve to enter drug treatment and the estimated time that it would take to complete a program and demonstrate thereafter that she could remain drug-free — all suggest that even under an interpretation of this record most favorable to the mother, Eric would have to wait at least another year or more in foster care before even an attempt to have him join his mother and siblings could be started. Considering the total lack of evidenced interest in his welfare since his birth (a telephone call to DCYS to see if Eric was still alive would not have brought the risk of arrest), the likelihood that any interpretation of these variables this favorable to her is not based on reality. This baby has waited long enough to "go home". See In Re Juvenile Appeal, (83-CD)189 Conn. 276, 292 (1983). CT Page 670
Before the court may consider terminating a parent's rights, however, it must consider the six factors set forth in subsection (d) of Sec. 17-43a;
(1) DCYS could offer no services to a parent whose whereabouts are unknown. The single time Tanya requested a visit, it was provided. DCYS offered to place Eric with her in Interval House, but she declined. Nothing else could have been done to assist a parent whose investment in drug abuse, criminal activity and evading arrest outweighs her concern for her child's welfare.
(2) No court orders or expectations could be imposed or suggested to Tanya since she stayed away from the court hearing when Eric was committed to DCYS in February of 1990, although she acknowledged she was aware of that hearing, and was whereabouts unknown thereafter until her most recent incarceration.
(3) Eric can have no feelings or emotional ties for a mother whom he has seen but once in his 14 months of life, and that when he was less than three months old. Unfortunately, due to the vagaries of the foster care system, no one has provided his care for a least one year with whom he could have developed significant emotional ties. It is precisely to avoid this impermanence that this termination action was initiated.
(4) Eric is 14 months old. He is a "cocaine baby" whose neurological, emotional, learning and psychological deficits will only be revealed with the passage of time. The only way for him — as for any baby — to maximize his potential is to know the security of a permanent home as soon as possible following the impermanence of his first 14 months of life.
(5) Tanya made no efforts, prior to her incarceration, to adjust her circumstances, conduct or conditions to make it in Eric's best interest to return to her in the foreseeable future. She did not visit or call him or his caretaker or legal guardian, and the reasons given — heavy drug use and fear of having arrest warrants served — do not suggest that Eric was a priority with her at any time.
(6) She was not prevented from maintaining relationship with Eric. The only time she requested a visit before this petition was filed, it was provided. Economic circumstances were never given as a reason why she did not make Eric a part of her life during his first year.
Having considered the foregoing, it is both clear and CT Page 671 convincing that Eric's best interest will only be served if his mother's parental rights are terminated so that he may be placed in the security of adoption without still further delay. Therefore, it is ORDERED that the parental rights of Tanya W., be and hereby are terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the said child in adoption and submit to this court in writing, no later than 90 days following the date of this judgment, a report as to the progress toward such adoption and thereafter in such forms and at such intervals as this court may from time to time require. If the child's adoption is not finalized by 4/30/92, the said commissioner is ORDERED to submit a motion to review plan for terminated child no later than that date.
7. Appeal
Tanya W., has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by her trial counsel of the court's judgment and her right to take an appeal, she affirmatively manifests her desire to do so, if her trial counsel is willing to act in that capacity, the court will appoint him for this purpose. If the respondent manifests her desire to take an appeal and if her trial counsel declines to represent her because in his professional opinion it lacks merit, he is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent mother will be informed by the clerk forthwith that she has the balance of the extended time to appeal in which to secure her own counsel who, if qualified, may be appointed to represent her on the appeal. If she does not do so, then upon expiration of the extended appeal period, her right to pursue an appeal will be ended and the termination of her parental rights final. The child will at that time, and not before, be free to be placed in adoption. If such procedures satisfy the sixth amendment right to counsel in criminal cases Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise him is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal CT Page 672 action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Hartford this 9th day of January, 1991.
BRENNEMAN, J.